[No. A132714. First Dist., Div. Four. Aug. 9, 2012.]

IDEAL BOAT & CAMPER STORAGE et al., Plaintiffs and Appellants, v. COUNTY OF ALAMEDA et al., Defendants and Respondents.

COUNSEL

Sheppard, Mullin, Richter & Hampton, David P. Lanferman and James G. Higgins for Plaintiffs and Appellants.

Donna R. Ziegler, County Counsel, Brian E. Washington, Chief Assistant County Counsel, and Erin H. Reding, Associate County Counsel, for Defendants and Respondents.

Shute, Mihaly & Weinberger and Tamara S. Galanter for Tri-Valley Conservancy as Amicus Curiae on behalf of Defendants and Respondents.

OPINION

REARDON, J.—Appellants Ideal Boat & Camper Storage (Ideal Boat) and the Migliore family[1] own a boat and camper storage operation in rural eastern Alameda County. Beginning in 1964, respondents County of Alameda (County) and its board of supervisors (Board), through a variety of land use decisions, have approved the use of the property for boat and recreational storage purposes. Then in 2010, the County denied appellants' application for site development review (SDR) to expand its storage facility on the rear half of the property to accommodate up to 720 additional vehicles and boats. Appellants unsuccessfully pursued a writ of mandate and declaratory and

---

[1] Members of the Migliore family are Steve Migliore, Carmen Migliore, Lola Migliore, and Caroline Assereto.

injunctive relief to overturn the denial. We conclude all relief was properly denied. While appellants can continue the existing operation which constitutes a legal nonconforming use, it cannot expand the use as proposed. The proposed expansion conflicts with (1) the East County Area Plan (ECAP), as modified in 2000 by the voter initiative Measure D, as well as (2) the South Livermore Valley Area Plan (SLVAP), which is incorporated into the ECAP. Accordingly, the County properly denied the 2010 SDR application.

## I.  FACTUAL BACKGROUND

A.  *Early Land Use History*

The Ideal Boat facility is housed on a 59.7-acre parcel in the unincorporated, rural area of East County. The zoning history begins in 1955, at which time the property was designated as part of an agricultural district. Then in 1964, the County granted the Migliores a use variance for an "equipment storage yard." The site was rezoned as a retail business district in 1976, when the County approved a conditional use permit to allow "open storage of recreational vehicles and boats" on the property.

In 1983, the County again rezoned the property to a planned development district, allowing "Agricultur[al] District uses . . . and also allowing indoor and outdoor storage of recreational vehicles, boats and contractors' equipment with storage uses being subject to [SDR]." As a zoning classification, planned development "allows a single zoning district to combine a variety of uses (residential, commercial, and even industrial) that are otherwise generally not permitted within the same zoning district." (Curtin's Cal. Land Use and Planning Law (31st ed. 2011) p. 70; see *Orinda Homeowners Committee v. Board of Supervisors* (1970) 11 Cal.App.3d 768, 772 [90 Cal.Rptr. 88].) In this case, the County planning department staff recommended reclassification, reasoning that it "would allow uses inconsistent with the General Plan, but the recommended [planned development] district would not preclude eventual use consistent with the County General Plan, and would provide a needed facility for the area."

In 1983, the County approved the first SDR application for expansion on the northern end of the property, subject to five conditions. These included requiring Ideal Boat to submit a landscaping, planting and maintenance plan "suitable for the Livermore area" that included plant screening of open storage areas and a drip irrigation system until the trees and shrubs became established.

The County approved the second SDR application for "expansion of a vineyard and recreational vehicle storage facility" in 1990, subject to seven conditions, including the dedication of a seven-foot right-of-way along Tesla Road.

## B. Land Use Planning Context

Every county must adopt a "comprehensive, long-term general plan for the physical development of the county . . . ." (Gov. Code, § 65300.)

Municipalities can comply with the general plan requirement by adopting one plan for the entire jurisdiction, or by adopting plans relating to "geographic segments of the planning area." (Gov. Code, § 65301, subds. (a), (b).) As becomes apparent, the County has proceeded under the area plan approach.

### 1. SLVAP

In the 1980's, a broad coalition of elected and appointed representatives from the County and the cities of Pleasanton and Livermore began working together to create a plan for the South Livermore Valley that would preserve the existing vineyards and promote and enhance viticulture and other cultivated agriculture. The Board adopted the SLVAP in 1993, providing a policy framework "to rejuvenate the South Livermore Valley as a premium wine producing region." The goals of the SLVAP include (1) promoting the South Livermore Valley as a unique and historic wine region; (2) taking a proactive approach to protect, enhance and increase viticulture and other cultivated agriculture; (3) preserving the area's unique rural and scenic qualities; and (4) discouraging and minimizing development on lands with existing vineyards and those suitable for agriculture.

To these ends the plan articulates three methods of encouraging agricultural expansion. The first is a program to expand viticulture acreage by offering economic incentives in exchange for preservation of agricultural land. Of interest is the establishment of a density bonus of up to four additional homesites per 100 acres or fraction thereof if the applicant can demonstrate that the bonus will contribute substantially to promoting viticulture or other cultivated agriculture. Additionally, the plan establishes a land trust to accept dedications of agricultural land and easements to permanently protect productive agricultural land. And finally, the plan requires all new urban development "to directly and substantially contribute to the preservation, promotion and expansion of viticulture in the Valley."

The SLVAP boundaries encompass the Migliores' property, identifying it as "Uncultivated Lands." The plan sets forth development standards for four

subareas, including the "Vineyard" subarea, within which the property is located. New commercial uses within this subarea are limited to "appropriate small-scale uses that promote the area's image as a wine region"; examples of appropriate commercial uses are "[w]ineries and small bed-and-breakfast establishments."

### 2. *ECAP; Measure D*

In May 1994, the Board adopted the ECAP, the comprehensive general plan for East County. The ECAP incorporates the SLVAP in its entirety. It appears from ECAP maps that the Migliores' site comes within the "large parcel agriculture" land use designation in that plan.[2]

In November 2000, the County voters passed an initiative amending the general plan governing land uses. Commonly known as Measure D, the initiative was enacted to protect agriculture and open space. (*Save Our Sunol, Inc. v. Mission Valley Rock Co.* (2004) 124 Cal.App.4th 276, 278 [21 Cal.Rptr.3d 171] (*Save Our Sunol*).) Measure D's stated purposes are "to preserve and enhance agriculture and agricultural lands, and to protect the natural qualities, the wildlife habitats, the watersheds and the beautiful open space of Alameda County from excessive, badly located and harmful development." (Measure D, § 1.) The measure revised the urban growth boundary in East County to reserve less land for urban growth and more for agriculture uses.

Measure D also amended the ECAP's land use policies for large parcel agriculture, rural residential and other designations, making them more restrictive. As amended by Measure D, the uses allowed in large parcel agriculture are as follows: "agricultural uses, agricultural processing facilities (for example wineries, olive presses), limited agricultural support service uses (for example animal feed facilities, silos, stables, and feed stores), secondary residential units, visitor-serving commercial facilities (by way of illustration, tasting rooms, fruit stands, bed and breakfast inns), recreational uses, public and quasi-public uses, solid waste landfills and related waste management facilities, quarries, windfarms and related facilities, utility corridors, and similar uses compatible with agriculture." Prior to Measure D, this designation permitted "other industrial uses appropriate for remote areas and

---

[2] This is also the County's position on appeal. However, a County planning department staff report and correspondence from the planning director characterize the general plan designation under the ECAP as "[r]ural [r]esidential." This confusion is also manifest in county counsel's statements to the planning commission (commission) and the Board in connection with the current SDR application; at the former, he placed the property in the "rural density residential" land use designation, but in the latter he identified the large parcel agriculture designation as the key provision.

determined to be compatible with agriculture, and similar and compatible uses . . . ." The rural density residential designation "permits single family detached homes, secondary residential units, limited agricultural uses, public and quasi-public uses, and similar and compatible uses."

Although Measure D does not affect uses that were legal at the time of the effective date, it nonetheless provides that "structures may not be enlarged or altered and uses expanded or changed inconsistent with [the] ordinance . . . ." (Measure D, § 22, subd. (a).) Further, except to the extent that one has a legal right to development, "the restrictions and requirements imposed by [the] ordinance shall apply to development or proposed development which has not received all necessary discretionary County and other approvals and permits prior to the effective date . . . ." (*Id.*, subd. (b).)

Board action is also circumscribed by Measure D, which states that "no subdivision map, development agreement, development plan, use permit, variance or any other discretionary administrative or quasi-administrative action which is inconsistent with [the] ordinance may be granted, approved, or taken." (Measure D, § 19, subd. (c).)

With respect to the SLVAP, Measure D sought to preserve the programs and policies set forth therein: "This ordinance shall not supersede or change the provisions of the [SLVAP] in the area to which the plan applied on February 1, 2000." (Measure D, § 6.)

C.   *Ideal Boat's Post-Measure D Actions*

In March 2001, Ideal Boat submitted an SDR application to expand the boat and recreational vehicle storage on the rear half of the lot. After the planning director and commission denied the application, county counsel determined that the variance process was the appropriate vehicle for acting on the application. According to a prehearing analysis, the primary reason for denial "was that the proposed expansion would be contrary to the policies of the [SLVAP] . . . . That Plan changed the policies for the area, with the intent of preserving and enhancing cultivated agriculture, particularly viticulture."

Thereafter, Ideal Boat applied for a variance, seeking to convert 30 acres of the lot to storage. County planning staff conducted an initial study pursuant to the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.). The analysis concluded that although the proposed project could have a significant effect on the environment, there would be no such effect based on the mitigation measures added to the project and accepted by the applicant. The study also indicated that the proposed project would have less than a significant impact on agricultural resources.

Nonetheless, planning staff recommended denial of the variance, noting that expansion would be contrary to "minimizing development on potentially productive agricultural land," and would be contrary to the goals and policies of the SLVAP. The matter was noticed for hearing before the County's board of zoning adjustments. Apparently that body denied the application, as it was followed by an unsuccessful appeal to the Board.

Undeterred, in 2009 the Migliores, through counsel, explored with the planning director the possibility of expanding their facility through another SDR application. The director advised that the County could not approve expansion of a nonconforming use, noting that the prior SDR's were approved *before* the passage of Measure D. Nonetheless he expressed the willingness to review and consider any contrary analysis. In response to further analysis by the Migliores' counsel, the director reiterated his position.

Then in December 2009, the Migliores submitted their last SDR application, proposing expansion over four phases of one-year increments on the rear half of the property, to include grading and drainage improvements; installation of moveable canopies varying from 32 to 44 feet in length and standing 16 feet tall and 12 feet wide; and landscaping improvements. The expansion would take place over the rear half of the property (approximately 30 acres), with 17.3 of those acres devoted to storage and a driveway. As well, the expansion would create more than one and a half acres of new impervious surface as a result of installation of the canopies. Finally, the proposal would add up to 720 new vehicles to the existing 1,100 boats and recreational vehicles stored on the property.

Staff recommended denial of the application on the rationale that the proposal would constitute an expansion of a nonconforming use, and thus was contrary to Measure D. The staff report also recommended dispensing with CEQA review under a provision that states CEQA does not apply to projects that an agency does not approve. However, if the commission were to determine that the application did not conflict with Measure D, the report indicated that staff should be directed to prepare an initial environmental study for the project.[3]

The matter came before the commission in June 2010. The commission watched the Migliores' video about the expansion and heard testimony from them, their counsel, and 16 other citizens, many of whom opposed the application. The commissioners were engaged in their consideration of the

---

[3] At the commission hearing, staff repeated its belief that expansion would violate Measure D. Anticipating the commission's likely denial of the application, and in order to save the Migliores time and money, staff indicated it did not prepare an environmental analysis of the project, but would do so if the commission approved the project.

application. One applauded the application, but thought the nonconforming use issue was "Land Use 101." He registered reluctance to do something that went against the intent of the Measure D voters. The chairperson indicated he would rather be talking about mitigation and "how many spaces you should have" instead of legal theory, but the debate was the interpretation of Measure D. The commission denied the application on a vote of five for denial, one dissent and one abstention.

At the Board hearing on the appeal, the video again was played and speakers pro and (mostly) con presented testimony. The Board heard and considered all reports, recommendations and testimony and ultimately denied the application. It made the following findings: (1) the existing facility is a nonconforming use under the ECAP, as modified by Measure D; (2) the proposal would expand a nonconforming use, contrary to Measure D and the zoning ordinance; (3) the Migliores may continue to operate storage facilities that existed prior to Measure D, but have no vested right to expand beyond what was previously approved; (4) the proposal conflicts with the ECAP (specifically, the SLVAP) because the property is nearly surrounded by vineyards and does not preserve scenic or rural qualities on lands suitable for viticulture or expand or enhance cultivated agriculture, nor does it promote the area's image as a wine region; and (5) the project is located within an area covered by the SLVAP, which was incorporated into the ECAP. Thus, the ECAP land use designations apply in the SLVAP.

D. *Litigation*

The Migliores petitioned for a writ of mandate challenging the Board's denial of their application, and sought declaratory and injunctive relief. The trial court denied all relief, ruling that fundamental vested rights were not implicated by the denial of the application; the SDR process is discretionary; Measure D did not permit expansion of the nonconforming use; and the Board did not abuse its discretion in concluding that the application was inconsistent with the ECAP, and substantial evidence supported that finding. This appeal followed entry of judgment.

## II. DISCUSSION

A. *Standard of Review*

Appellants maintain that the standard of review of the County's quasi-adjudicatory denial of their SDR application derives from Code of Civil Procedure section 1094.5, which applies to review of an administrative decision that was made "as the result of a proceeding in which by law a hearing is required to be given . . . ." (*Id.*, subd. (a).) However, if the

administrative agency provides a hearing but by law it was *not required* to do so, administrative mandamus does not apply. (*Keeler v. Superior Court* (1956) 46 Cal.2d 596, 599 [297 P.2d 967]; *Shelden v. Marin County Employees' Retirement Assn.* (2010) 189 Cal.App.4th 458, 462–463 [116 Cal.Rptr.3d 883].) Here, the SDR procedure specifies that "[t]he planning director or his designated representative shall receive and decide applications for site development review. *No public hearing is required*, but the planning director may give such notice as he deems appropriate." (Alameda County Zoning Ord., § 17.54.220, subd. A, italics added.) Although the planning director in his discretion conducted a hearing on the SDR application, such a hearing was not required and Code of Civil Procedure section 1094.5 does not apply. Instead, this matter is governed by the traditional mandamus statute.

When a party seeks review of an administrative decision pursuant to Code of Civil Procedure section 1085, judicial review is limited to examining the agency proceedings to ascertain whether the agency's action has been arbitrary, capricious or lacking entirely in evidentiary support, or whether the agency failed to follow the proper procedure and give notices required by law. And, where the case involves the interpretation of a statute or ordinance, our review of the trial court's decision is de novo. (*Pomona Police Officers' Assn. v. City of Pomona* (1997) 58 Cal.App.4th 578, 584 [68 Cal.Rptr.2d 205].)

## B. *Ideal Boat Cannot Expand Under Current Law*

The Migliores advance several arguments favoring their right to expand vehicle storage on their property. None is persuasive.

### 1. *The Proposed Expansion Is Inconsistent with Measure D and the ECAP, Which Incorporates the SLVAP*

#### a. *Legal Framework*

The general plan is the fundamental source of local land use policy and law, and heads up the hierarchy of government review as the " 'constitution for all future developments.' " (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570 [276 Cal.Rptr. 410, 801 P.2d 1161].) The propriety of virtually *any* local land use or development decision depends on consistency with the general plan and its elements. (*Ibid.*) Indeed, state law mandates that subordinate land use regulations be consistent with the general plan. (Gov. Code, §§ 65359, 65454, 65860.) A project is consistent with the general plan if it will further the plan's objectives and policies and not obstruct their attainment. The proposed development "must be 'compatible with' the objectives, policies, general land uses and programs

specified in the general plan." (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1336 [74 Cal.Rptr.2d 1] (*FUTURE*).) In addition, a project's consistency with some general plan policies will not overcome inconsistencies with a policy that is fundamental, mandatory and clear. (*Id.* at pp. 1341–1342.) Moreover, even in the absence of an outright conflict, a local agency will not approve a project that is not compatible with, and would frustrate, the general plan's goals and policies. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 378–379 [110 Cal.Rptr.2d 579].)

### b. *Analysis*

At the outset we point out that storage of recreational vehicles or boats is not an allowed use for the property under the ECAP as amended by Measure D. Whether the property comes within the ECAP's large parcel agricultural land use designation or the rural density residential designation, the list of allowable uses, quoted above, does not include such use. Nor does the SLVAP permit commercial storage uses; it only permits "appropriate small-scale uses that promote the area's image as a wine region . . . ."

Appellants argue nonetheless that storage uses are no less compatible with agriculture than silos, inns, utility corridors or wind farms, which are allowed under the ECAP's large parcel agricultural provisions. We disagree. The listed uses are aimed at preserving agricultural lands and open space, and facilitating and enhancing agriculture; appellants' proposed expansion of its boat and recreational vehicle storage, taking over existing agricultural land, adding up to 720 new vehicles and boats and dotting the landscape with large moveable canopies, is not. The proposed expansion fails the consistency test for lack of compatibility with the general land uses specified in the general plan as amended by Measure D.

As significant, the proposed expansion would violate the goals and policies of the SLVAP, which Measure D preserves. (Measure D, § 6.) SLVAP goals include promoting the area as a unique and historic wine region; preserving its unique rural and scenic qualities; minimizing development on land with existing vineyards and those suitable for viticulture; and directing development away from productive and potentially productive agricultural land. Objectives and policies include prohibiting additional development unless directly in furtherance of expanding and enhancing cultivated agriculture, and maintaining and enhancing the area's visual quality by limiting inappropriate uses in viticultural areas.

These SLVAP objectives and policies, incorporated into the ECAP as revised by Measure D, are not mere suggestions; they are mandatory directives ("*shall prohibit* **additional development**"; "*shall maintain and enhance*

the visual quality" (italics added)). (See *FUTURE, supra*, 62 Cal.App.4th at pp. 1341–1342.) Without question, the expansion of the storage facilities onto acres of agricultural lands nearly surrounded by wineries and vineyards, with the potential addition of 720 more vehicles and boats, would conflict with the goals, objectives and policies of the SLVAP. Such expansion would not preserve the South Livermore Valley's rural, scenic and visual qualities, nor expand or enhance cultivated agriculture or promote the area's image as a wine region. In a word, the proposed expansion is not compatible with, and indeed would frustrate, the goals, objectives and policies of the SLVAP. Under Measure D the County was barred from taking, approving or granting "any . . . discretionary administrative or quasi-administrative action" such as acting on the SDR, "which is inconsistent with this ordinance." (Measure D, § 19, subd. (c).)

Appellants also assert that there is "no evidentiary support" that their application was "inconsistent." Not so. The lack of consistency, explained above, is inherent in the proposed expanded use as compared with allowable ECAP and SLVAP uses. Lack of consistency is also inherent in any examination of the proposed expansion as to whether it would further or impede the goals, objectives and policies of the SLVAP.

Appellants apparently believe that the 1983 planned development zoning and prior SDR approvals constitute a conclusive determination on the part of the County that their storage use is consistent with agricultural designations. They point out that when the County rezoned the property to planned development allowing storage uses, the Board specifically found that the reclassification "would not preclude eventual use of the property consistent with the County General Plan . . . ." In other words, the storage uses would not preclude eventual return of the property to agricultural uses. Appellants ignore the current reality—the current general plan and the ECAP as amended by Measure D and which preserves the SLVAP. The current expansion is tested against these planning tools for consistency; prior expansions and prior approvals are largely irrelevant to the current inquiry.

2. *The Ideal Boat Facility Is a Legal Nonconforming Use; Measure D Prohibits Expansion of Nonconforming Uses*

    a. *Legal Nonconforming Use*

▮ Appellants' existing operation has become a legal nonconforming use. The classic definition of a legal nonconforming use is "one that existed lawfully before a zoning restriction became effective and that is not in conformity with the ordinance when it continues thereafter." (*Hansen Brothers Enterprises, Inc. v. Board of Supervisors* (1996) 12 Cal.4th 533, 540, fn. 1 [48

Cal.Rptr.2d 778, 907 P.2d 1324].) ■ The County zoning ordinance similarly provides that a nonconforming use is a use "lawfully occupying . . . land which no longer conforms to the regulations of the district in which it is located due to the adoption of the zoning ordinance or a subsequent amendment thereto . . . ." (Alameda County Zoning Ord., § 17.52.610.) Measure D specifically addresses the continuation of nonconforming uses, stating that although it "does not affect existing . . . uses that are legal at the time" of its enactment, such uses may not be "expanded or changed inconsistent with [the] ordinance . . . ." (Measure D, § 22, subd. (a).) This restriction applies as follows: "Except to the extent there is a legal right to development, the restrictions and requirements imposed by this ordinance shall apply to development or proposed development which has not received all necessary discretionary County and other approvals and permits prior to the effective date . . . ." (*Id.*, § 22, subd. (b).)

Appellants assert that the existing storage use is not a nonconforming use because Measure D did not change the existing planned development zoning previously legislated for the property, and that zoning remains in effect today. Moreover, it points out that if a county perceives that an amendment to its general plan renders the preexisting zoning inconsistent with the amended general plan, pursuant to Government Code section 65860, subdivision (c),[4] the county must take new legislative action to amend the zoning ordinance within a reasonable time. The County has taken no such action.

■ We first note that this lawsuit does not raise the question of whether the County should have conformed its zoning for the property to its general plan after adoption of the SLVAP, the ECAP and/or Measure D. In any event, as recently explained in a treatise, when a jurisdiction amends its general plan but fails to amend the corresponding zoning regulations, "any proposed change in the use or to the site that requires a discretionary action that is consistent with the zoning, but inconsistent with the new general plan provision, would require a finding that the use is consistent with the general plan. Because such a finding could not be made, the inconsistency would effectively create a nonconforming use." (1 Cal. Land Use Practice (Cont.Ed.Bar 2011) Nonconforming Uses, § 8.4, p. 336.)

This is precisely the case here. Neither the commission nor the Board made a finding that the proposed expansion was consistent with the general plan and the ECAP, as amended by Measure D, nor, based on the above reasoning, could such a finding be made. Denying the appeal for SDR, the Board found

---

[4] Government Code section 65860, subdivision (c) states: "In the event that a zoning ordinance becomes inconsistent with a general plan by reason of amendment to the plan, or to any element of the plan, the zoning ordinance shall be amended within a reasonable time so that it is consistent with the general plan as amended."

that the proposal was inconsistent with the SLVAP as incorporated into the ECAP; under the ECAP, the existing storage facility constituted a nonconforming use; and expansion of such nonconforming use would be contrary to Measure D. These findings were sound.

### b. Save Our Sunol *Does Not Help Appellants*

One more aspect of Measure D merits exploring, namely the provision making its prohibition against the expansion of nonconforming uses applicable to proposed development "which has not received all necessary discretionary County and other approvals and permits" pre-Measure D. (Measure D, § 22, subd. (b).) Ideal Boat's operation post-Measure D is thus ultimately doomed, unless, prior to the enactment of Measure D, the County had granted Ideal Boat the right to proceed with the project. It had not.

Measure D went into effect December 22, 2000. (*Save Our Sunol, supra*, 124 Cal.App.4th at p. 279.) The 1983 planned development zoning allowing the indoor and outdoor storage of recreational vehicles and boats was specifically subject to SDR approval. On two occasions prior to Measure D, SDR approval preceded expansion of the Ideal Boat operation. The third application, post-Measure D, was denied as inconsistent with Measure D, the ECAP and the SLVAP.

Starting with the fact that the County's 1983 policy decision to allow storage uses as part of the approved planned development zoning for the property, coupled with two SDR approvals, bestows continuing lawful status on the *existing* storage use, appellants seem to contend that such lawful use extends to the entire tract and encompasses any post-Measure D expansion of the use on the subject property, citing *Save Our Sunol. Save Our Sunol* involved a quarry which had been under development for years prior to Measure D. Also prior to Measure D, the County had approved the quarry by issuing a surface mining permit. (*Save Our Sunol, supra*, 124 Cal.App.4th at pp. 278, 282.) Opponents of the quarry sought to enjoin the project. Measure D included a policy directed at new quarries, specifically prohibiting the County from approving a new quarry unless voter approval was also obtained. (124 Cal.App.4th at pp. 278, 282.) This court held that Measure D did not apply to the quarry "that was approved by the County through issuance of a surface mining permit *before* the initiative's enactment." (124 Cal.App.4th at p. 284, italics added.)

Appellants latch on to the court's earlier statement that "Measure D also expressly exempts from its operation preexisting legal land uses and rights to development." (*Save Our Sunol, supra*, 124 Cal.App.4th at p. 281.) We agree that the *preexisting* storage facilities may continue, but appellants have no

rights to future development and expansion. All they have is the ability to pursue a discretionary SDR approval, at which juncture the project can be properly denied. Appellants received no approvals for the expansion of their business to a new portion of the property prior to the passage of Measure D. The current application was submitted nine years after that date and requests a four-phase expansion to a new portion of the property. As the trial court correctly concluded, while the use on the northern end of the property is a legal, existing use, expansion of that use to the southern end is a new use to which Measure D applies.

### c. *The SDR Process Is Discretionary*

Appellants also attack the County's "rote" characterization of its SDR process as discretionary, in effect arguing that the SDR process entails such limited discretion as to render the decision ministerial. We reject this characterization.

■ In the context of traditional mandamus, discretion is the power conferred on a public official to act according to the dictates of his or her own judgment. (*Morris v. Harper* (2001) 94 Cal.App.4th 52, 63 [114 Cal.Rptr.2d 62].) To determine whether the County's SDR process amounts to a discretionary approval, we look to the plain language of the SDR ordinance. Its purposes are to "promote orderly, attractive, and harmonious development; recognize environmental limitations on development; stabilize land values and investments; and promote the general welfare by preventing establishment of uses . . . having qualities which would not meet the specific intent clauses or performance standards of this title or which are not properly related to their sites, surroundings, traffic circulation, or their environmental setting." (Alameda County Zoning Ord., § 17.54.210.) ■ To accomplish these broad, open-ended purposes, the ordinance vests broad discretion in County decision makers. Specifically, it empowers the planning director to conduct an investigation or, if in his or her opinion the proposed use might cause certain objectionable conditions, refer the investigation to an expert consultant; seek outside counsel from municipal agencies on matters that might affect the proposed use; hold a public hearing; and attach conditions[5] to an SDR approval. (*Id.*, §§ 17.54.220, subd. A, 17.54.240, 17.54.250, 17.54.260.) The ultimate decision to approve or reject the SDR application entails an evaluation of whether the project satisfies the requirements and *intent* of the code. These factors define a quintessential discretionary approval

---

[5] The prior SDR approvals entailed imposition of significant conditions, including submitting a landscaping planting and maintenance plan suitable for the area, complete with screenings and irrigation, and the dedication of a right-of-way to mitigate traffic concerns. These and other substantive conditions demonstrate the discretionary nature of the SDR and approval process.

process involving the exercise of personal judgment. As the trial court aptly noted, "[n]one of these processes would have been warranted if the SDR process simply required staff to review the paperwork and stamp it."

Nearly 30 years ago, the First District Court of Appeal determined that the County's SDR process was discretionary. In *Wesley Investment Co. v. County of Alameda* (1984) 151 Cal.App.3d 672 [198 Cal.Rptr. 872] (*Wesley*), the reviewing court analyzed a substantially similar earlier version of the SDR ordinance, concluding that the County did not abuse its discretion in denying the property owner's proposed use, and also characterizing the ordinance as allowing the County decision makers to " 'exercise their judgment so as to *deny* a Site Review application' " (*Wesley*, at pp. 679–680). In a similar vein, the reviewing court in *Guinnane v. San Francisco City Planning Com.* (1989) 209 Cal.App.3d 732, 736 [257 Cal.Rptr. 742] resolved that the city's planning commission was empowered to exercise discretionary review to determine that a proposed residential development was unsuitable for a particular location. So holding, it analogized the San Francisco process to the County's SDR process and ordinance described in *Wesley*, noting that such process "called for an exercise of discretion" to prevent establishment of certain unsuitable uses. (*Ibid.*)

Notwithstanding the plain language of the ordinance and supporting case law, appellants assert that where a municipal code directs that a permit be issued when the application complies with existing regulations, issuance of the permit is not discretionary. They refer us to *Court House Plaza Co. v. City of Palo Alto* (1981) 117 Cal.App.3d 871, 883 [173 Cal.Rptr. 161], holding that issuance of a permit is not discretionary under an ordinance providing that upon payment of a fee, a use permit "shall be issued" (italics omitted) without a public hearing if the proposed structure complies with the development plan. In contrast, the SDR ordinance permits a public hearing (but does not require one) and, as outlined above, imparts to decision makers broad discretion to determine whether a proposal meets the requirement *and intent* of the code prior to approving, disapproving or subjecting approval to conditions.

### 3. *Appellants Have No Vested Rights to Expand*

Appellants also claim that as a result of their investment in the property and contributions to the County made in reliance on past SDR approvals, their right to expand storage uses to new portions of the property, subject only to the SDR process, became "vested."[6] The vested rights cases touted by appellants are of no help.

---

[6] At oral argument appellants similarly contended that the 1984 and 1990 SDR approvals contemplated a *phased* expansion of storage usage. The record does not support the contention that the County approved a "phased" plan. The maps, paperwork and approvals do not

In *Russ Bldg. Partnership v. City and County of San Francisco* (1988) 44 Cal.3d 839, 845–846 [244 Cal.Rptr. 682, 750 P.2d 324] (*Russ*), our Supreme Court held that a developer owner who performs substantial work and incurs substantial liabilities in good faith reliance on a government-issued permit acquires a vested right to finish construction under the terms of the permit. Thus, the government may not, by virtue of changed zoning laws, prohibit construction authorized by a permit. In that case, the resolutions authorizing the building permits included a transit mitigation condition that contemplated application of a later-enacted ordinance imposing transit fees as a prerequisite to issuing a certificate of completion and occupancy. (*Id.* at pp. 846–849.) Hence, the developers' vested property rights were not impaired by application of the new ordinance to them. (*Id.* at p. 854.)

Unlike the situation in *Russ*, here appellants had not received all approvals for their expansion prior to the passage of Measure D, nor had they begun construction. In other words, the *Russ* plaintiffs had vested rights to complete construction; appellants had no vested rights to expansion.

*Hock Investment Co. v. City and County of San Francisco* (1989) 215 Cal.App.3d 438 [263 Cal.Rptr. 665] (*Hock*) involved an apartment house owner's challenge to the city's condominium conversion ordinance and the department of public works' denial of the owner's application to convert. When the plaintiff owner submitted the conversion application, a department order provided that all requests to convert would be subject to the law applicable at the time of submission. After the plaintiff submitted the application, the city passed the condominium conversion ordinance establishing a moratorium on conversions. The reviewing court held that the department of public works had given the plaintiff an express promise that its application would be evaluated under the ordinance in effect when the application was submitted. If the plaintiff reasonably relied to its detriment on that promise, the city would be estopped from applying the new ordinance to it. (*Id.* at pp. 448–449.)

Appellants maintain that such an express promise exists to hear and decide the SDR application, namely the following SDR provision: "The planning director shall hear and decide applications to modify any plan approved under the procedure for [SDR] . . . , subject to the same procedure and regulations as those applicable to the original application." (Alameda County Zoning Ord., § 17.54.290.) Whatever this provision means, it does not trump, nor

---

reference "phases" for future expansion. The record does include a 1984 site plan with demarked phases, but that plan was not the one submitted to, nor approved by, the County. Additionally, contrary to appellants' assertion at oral argument, the SDR ordinance does allow the County to determine whether a proposed use is permitted. (Alameda County Zoning Ord., §§ 17.54.210, 17.54.260.)

presume to trump, the general plan and the ECAP as amended by Measure D. The doctrine of preeminence of the general plan over inferior land use regulation such as a zoning ordinance has been around for a long time, certainly prior to the first time the Migliores pursued an SDR application in 1983. (See *Resource Defense Fund v. County of Santa Cruz* (1982) 133 Cal.App.3d 800, 806 [184 Cal.Rptr. 371]; *Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 997 [165 Cal.Rptr. 514].) As we have determined, the proposed expansion conflicts with the general plan and the ECAP as amended by Measure D. *Hock* says nothing about this dynamic, and thus cannot speak to the legal issues attendant to this case.

C. *The County Exercised Its Discretion in Considering the Current Application for SDR*

Appellants contend that the County failed to exercise its discretion to consider the SDR application on the merits, based on the faulty presumption that Measure D deprived it of discretion to approve the application. As they did below, appellants request that, short of outright reversal, we remand the case "to the County Planning Director for review of the SDR application on the merits, and for consideration of appropriate conditions of approval . . . ."

Certainly the potential legal bar of Measure D to the SDR application was a key determinant in these proceedings. As part of the SDR process, planning staff and decision makers analyzed how Measure D would affect approval or denial of the SDR application, an appropriate level of review focused on the legal parameters of the land use matter at hand. However, that is not all that occurred.

The June 2010 staff report to the commission on the Migliores' SDR application evaluated not only the ramifications of Measure D, but also compliance with the SLVAP and the County zoning ordinance.[7] Moreover, although staff recommended denial of the application, the report did not foreclose the possibility that the commission would approve the application, stating that if the commission found the application did not conflict with Measure D or the SLVAP, then staff should be directed to prepare an initial study for the proposed expansion. Concerning compatibility with the SLVAP goals, objectives and policies, the report noted that the project "is nearly surrounded by vineyards and does not preserve rural nor scenic qualities on [the] lands suitable for viticulture, nor does it expand or enhance cultivated agriculture, nor promote the area's image as a wine region."

Additionally, at both the commission and Board hearings, decision makers watched a video explaining the contributions of Ideal Boat to the area and

---

[7] Similarly, a letter to the Board reprised the same compliance concerns.

heard testimony from appellants, their counsel, and from numerous members of the public regarding the pros and cons of the merits of an expanded operation. Many observed that the project would be inconsistent with the ECAP and the SLVAP.[8] As the trial court pointed out, the dialogue was not aimed primarily at the *legal* restrictions on the exercise of discretion created by Measure D.

The record demonstrates that the County considered the application on its merits, notwithstanding that Measure D raised significant legal impediments to its approval. The review process was multifaceted and thorough. The Board heard and considered all reports, recommendations and testimony, and ultimately rejected the application for *two* primary reasons: (1) the proposal would expand a nonconforming use contrary to Measure D and the zoning ordinance, and (2) the proposal conflicted with the SLVAP because it would not (a) preserve rural or scenic qualities on lands suitable for viticulture, (b) expand or enhance cultivated agriculture, or (c) promote the area's image as a wine region.

D. *The County's Interpretation of Measure D Does Not Delegate Administration of the Zoning Ordinance to the Electorate*

■ On a related note, appellants contend that the County's interpretation of Measure D operates to unconstitutionally delegate administration of the zoning ordinance to the electorate. We agree that "[l]egislative acts, such as the amendment of a general plan, are subject to the initiative process but administrative or executive acts, such as the granting or denial of a conditional use permit, are not." (*Save Our Sunol, supra*, 124 Cal.App.4th at p. 284.)

To begin with, the thrust of appellants' argument eludes us. They give us string cites and sweeping generalizations, but no analysis or specifics— indeed, they fail to identify the flawed "interpretation," let alone explain how it delegates administration of the zoning ordinance to the electorate.

■ In any event, Measure D does not afford the County electorate any rights with respect to the issuance of permits, approval of SDR applications, or the like. The authority to issue permits and review, approve, deny or condition an SDR application remains with the County. On the other hand, Measure D *does* legislate uses, goals, objectives and policies that, as applied to the present SDR application, render the proposed expansion of Ideal Boat incompatible with the amended County general plan and the ECAP and the SLVAP. As well, Measure D prevents expansion of nonconforming uses as a

---

[8] Numerous letters and e-mails were also submitted in the same vein.

general legislative policy that, as applied to the present SDR application, dooms its viability. Applying land use legislation to a given set of facts does not transform the legislation into an administrative act.

## III. DISPOSITION

The judgment denying appellants' petition for writ of mandate and request for injunctive and declarative relief is affirmed.

Ruvolo, P. J., and Rivera, J., concurred.