Filed 8/9/23  Save North Livermore Valley v. County of Alameda CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SAVE NORTH LIVERMORE VALLEY et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF ALAMEDA, <br><br> Defendant and Respondent; <br><br> INTERSECT POWER, LLC, et al., <br><br> Real Parties in Interest and Respondents. | A165768 <br><br> (Alameda County Super. Ct. No. RG21095386) |

Save North Livermore Valley, a private group of concerned citizens, and the Ohlone Audubon Society (collectively, plaintiffs) appeal from a judgment denying a petition for writ of mandate against the County of Alameda and real parties in interest, Intersect Power, LLC, and IP Aramis, LLC (collectively, defendants).  Plaintiffs seek to set aside the county's decisions to approve the Aramis Solar Energy Generation and Storage Project (Project) and to certify a final environmental impact report (FEIR) under the California Environmental Quality Act (CEQA)

1

(Pub. Resources Code, § 21000 et seq.).[1]  They contend that the county failed to make a finding supported by substantial evidence that the Project was consistent with the county's general plan and local zoning laws and that the FEIR failed to adequately analyze the Project's long-term water needs and wildfire risks under CEQA.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   *The Project*

The Project is a solar energy facility (SEF) which is to include approximately 267,000 solar panels, a substation and generation intertie line, interconnection facilities, operation and maintenance buildings, a battery energy storage system, roadways and other facilities, and concomitant agricultural uses, including sheep grazing and honeybee forage.  The Project would provide solar power to utility customers by interconnecting to the regional electrical grid at an adjacent Pacific Gas and Electric Company (PG&E) existing substation.  The Project site is 347 acres of undeveloped land in the unincorporated North Livermore area of Alameda County, approximately 2.25 miles north of the City of Livermore and I-580.  The Project site is bound by Manning Road to the north, North Livermore Avenue to the east, and a private driveway to the south.  The original proposed Project encompassed land designated by the county general plan as large parcel agriculture (LPA), water management (WM), and resource management (RM).  Most of the Project site is designated as LPA.  Twenty-one acres are a part of a 400-foot-wide corridor along Cayetano Creek that is

---

[1] Unless otherwise stated, all statutory references are to the Public Resources Code.  Subsequent references to "Guidelines" are to the State CEQA Guidelines found in the California Code of Regulations, title 14, section 15000 et seq.

designated as WM. The entire Project site is in the A (agricultural) zoning district.

## II. *Project Approval*

In 2018, real parties applied for a conditional use permit (CUP). A draft environmental impact report (DEIR) was prepared and circulated for public review between September 18, 2020, and November 2, 2020. The DEIR addressed the environmental impacts of the Project and considered proposed project alternatives, including the resource management avoidance (RMA) alternative, which would decrease the size of the Project and avoid using any of the RM area.

The East County Board of Zoning Adjustments (EBZA) held meetings on the Project in May, October, and November 2020. The EBZA heard from planning staff and the public. The planning staff's report found that the initial Project was consistent with the LPA and WM general plan designations but inconsistent with the RM general plan designation. It recommended that the EBZA approve the RMA alternative and find the Project consistent with the county's general plan and zoning ordinance. The planning staff's report explained that staff interpreted the general plan to allow new infrastructure, along with public and quasi-public facilities, in the LPA and WM land use categories and found that solar development is comparable to other uses specifically allowed in the LPA and WM categories. The report also explained that the Project was consistent with several county policies,[2] including policy 218, which allows development of public facilities, and policy 13, which permits new infrastructure, defined to include public

---

[2] The Alameda County East County Area Plan (ECAP) explains that the county adopted goals, policies, and programs which were modified over time. It defines "policies" as "focused statements of how the county will achieve the stated goals."

3

utilities, needed to service the East County. Planning staff reported that the Project will serve the energy needs of the East County and other communities, support initiatives aimed at providing sustainably sourced energy, and would not have excessive growth-inducing impacts on the East County areas.

The EBZA voted to approve a CUP for the RMA version of the Project. The approved Project avoided development in the RM-designated portion of the Project site. The EBZA also certified the FEIR as having complied with CEQA.

Plaintiffs appealed the EBZA decision to the Alameda County Board of Supervisors (Board). The Board denied the appeal. It found the project to be consistent with the general plan and to be a conditionally permitted use in the A (agricultural) district. The Board approved the RMA version, certified the FEIR, adopted findings of significant effects and a statement of overriding considerations, and adopted a mitigation monitoring reporting program containing over 60 mitigation measures designed to avoid or lessen environmental impacts.

III. *Petition*

In April 2021, plaintiffs filed a petition for writ of mandate to set aside the Board's approval of the Project and certification of the FEIR. The first amended petition asserted that the Board's approval of the Project violated Measure D,[3] the general plan, and zoning ordinances. It also alleged four

---

[3] Measure D, the "Save Agriculture and Open Space Lands Initiative," is an initiative approved by voters in 2000 which amended portions of the county general plan, including the ECAP. Its purpose is "to preserve and enhance agriculture and agricultural lands, and to protect the natural qualities, the wildlife habitats, the watersheds and the beautiful open space of Alameda County from excessive, badly located and harmful development."

4

violations of CEQA based upon:  the failure to adequately analyze and mitigate project impacts, the failure to identify project alternatives, the failure to provide a proper project description, and the failure to recirculate the environmental impact report (EIR).

After considering briefing and the parties' oral arguments, the trial court issued a detailed, 47-page order denying the petition.  Judgment was entered in favor of the county and real parties.

On appeal, the plaintiffs argue that (1) the Board failed to make a finding supported by substantial evidence that the Project was compatible with Measure D and the ECAP, (2) the Project is not permitted in the A (agricultural) zoning district, (3) the EIR failed to adequately analyze the Project's long-term water needs and their significant environmental impacts, and (4) the EIR failed to adequately analyze and mitigate the Project's potential to exacerbate wildfire risks.

## DISCUSSION

We first address plaintiffs' arguments regarding planning and zoning inconsistencies and then turn to their arguments relating to the FEIR.

## I.    *General Plan Consistency*

Plaintiffs contend the Board failed to make a finding supported by substantial evidence that the Project is consistent with the county's general plan, which includes Measure D and the ECAP.  We first summarize the applicable legal principles and the general terms of the ECAP before analyzing plaintiffs' arguments.

_____

Following voter approval of Measure D, the county incorporated it into the ECAP.

5

## A. Legal Principles

Each county must adopt a general plan, which has been described as the " ' " 'constitution for all future developments' . . . ." ' " (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 355; Gov. Code, § 65300.) The county may then "prepare specific plans for the systematic implementation of the general plan for all or part of the area covered by the general plan." (Gov. Code, § 65450.) The specific plan must be consistent with the general plan. (Gov. Code, § 65454.)

On appeal from a mandate proceeding, our task "is essentially identical to that of the trial court. [Citation.] Accordingly, 'we review the agency's actions directly and are not bound by the trial court's conclusions.' " (*Wollmer v. City of Berkeley* (2009) 179 Cal.App.4th 933, 939.) " '[A] governing body's conclusion that a particular project is consistent with the relevant general plan carries a strong presumption of regularity that can be overcome only by a showing of abuse of discretion.' [Citations.] 'An abuse of discretion is established only if the city council has not proceeded in a manner required by law, its decision is not supported by findings, or the findings are not supported by substantial evidence. (Code Civ. Proc., § 1094.5, subd. (b).)' " (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816.) "A project need not conform perfectly to every general plan policy to be consistent with the general plan. [Citation.] The rule of general plan consistency is that the project 'must be "compatible with the objectives, policies, general land uses, and programs specified in" ' the general plan. . . . '[C]ourts accord great deference to a local governmental agency's determination of consistency with its own general plan, recognizing that "the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying

6

them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes." ' " (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 501.)

"It is, emphatically, *not* the role of the courts to micromanage these development decisions. Our function is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the city officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence." (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719–720 (*Sequoyah Hills Homeowners Assn.*).) Courts may not substitute their view for the view of the city officials, nor reweigh conflicting evidence. (*Id.* at p. 717.) As explained by our Supreme Court: "Reviewing courts must defer to a procedurally proper consistency finding unless no reasonable person could have reached the same conclusion." (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 155 (*Orange Citizens for Parks & Recreation*).)

### B.    ECAP Amended by Measure D

The ECAP,[4] as amended by Measure D, divides the East County area with an urban growth boundary. The areas within the boundary, which are next to existing cities, are generally suitable for urban development, whereas areas outside the boundary are suitable for long-term protection of natural

---

[4] Although plaintiffs reference the general plan, their specific complaints relate to the Project's compatibility with land designations discussed in the ECAP, as amended by Measure D. Accordingly, our discussion focuses on the ECAP, which covers the Project site.

resources, agriculture, and public health and safety. ECAP's policy 54 states that in areas outside the urban growth boundary, "[t]he County shall approve only open space, park, recreational, agricultural, limited infrastructure, public facilities (e.g., limited infrastructure, hospitals, research facilities, landfill sites, jails, etc.) and other similar and compatible uses . . . ." Much of the land outside the urban growth boundary is designated by the ECAP as LPA, RM and WM.

As noted, the approved Project was the RMA version, which includes only WM- and LPA-designated lands. The ECAP describes the type of development permitted in each designation. The LPA designation permits agricultural uses and processing facilities, recreational uses, public and quasi-public uses, solid waste landfills and related waste management facilities, quarries, windfarms and related facilities, utility corridors, and similar uses compatible with agriculture. The WM designation permits "sand and gravel quarries, reclaimed quarry lakes, watershed lands, arroyos, and similar and compatible uses."

The ECAP also contains multiple county policies, including policy 13, which states: "The County shall not provide nor authorize public facilities or other infrastructure in excess of that needed for permissible development consistent with the Initiative [Measure D]. This policy shall not bar 1) new, expanded or replacement infrastructure necessary to create adequate service for the East County, . . . and 3) infrastructure such as . . . power transmission lines which have no excessive growth-inducing effect on the East County area and have permit conditions to ensure that no service can be provided beyond that consistent with development allowed by the Initiative. 'Infrastructure' shall include public facilities, community facilities, and all structures and development necessary to the provision of public services and utilities." The

8

ECAP's discussion of both the LPA and the WM specifically refers to policy 13's allowance for infrastructure.

## C. Analysis

Plaintiffs' position that the Project is incompatible with the general plan, the ECAP, and Measure D is based on three subarguments: (1) the Board did not find that the Project's solar panels were similar to and compatible with uses allowed in the WM areas, and substantial evidence does not support such a finding; (2) the Board failed to make a finding that the Project's uses were similar to uses allowed in LPA areas, and substantial evidence does not support such a finding; (3) the Board failed to analyze whether battery storage was consistent with the LPA designation. We address each argument in turn.[5]

### 1. Compatibility with Uses Permitted in WM Areas

Although plaintiffs assert the Board did not find the Project compatible with uses permitted in WM areas, the Board's resolution plainly did so. The Board found: "The project is in conformance with the [ECAP], as amended by Measure D. . . . SEFs like the project meet the general plan goals and policies and conform to the allowable uses for the LPA and WM areas. SEFs like the project are similar in character to other uses explicitly allowed in the general plan designations, such as windfarms, quarries and public uses. The project does not increase capacity and provides expanded service of renewable energy needed by customers in Alameda County and is therefore in

---

[5] Plaintiffs and defendants (including real parties) each filed requests for judicial notice asking us to take notice of documents that were not part of the administrative record and that the trial court did not consider. Plaintiffs also filed an application for permission to file a reply brief in support of their request for judicial notice. We deny plaintiffs' application and deny both parties' requests for judicial notice.

9

conformance with the ECAP." It also found: "In the [WM] designation, the County's analysis has concluded that the findings of a site-specific hydrological engineering study (Appendix G of the DEIR) demonstrates that the project is consistent with the water quality and floodplain maintenance policies of the WM designation, and comparable to other uses allowed in WM such as residential, agricultural, sand and gravel quarries, reclamation pits, and public use areas."

Given that the WM does not specifically list SEF's as a permitted use, the question becomes whether substantial evidence supports the Board's finding that SEF's are a "similar and compatible use" to the other permitted uses listed for the WM, such as sand and gravel quarries and reclaimed quarry lakes. Preliminarily, we note that the language of the ECAP specifically permitting "similar and compatible uses" allows for some flexibility in making land use determinations. (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 515 (*San Francisco Tomorrow*) [recognizing general plans reflect range of competing interests and board of supervisors has discretion to weigh and balance a general plan's policies in making consistency determinations].) Substantial evidence supports the Board's findings here. Plaintiffs complain that the Board's findings did not explain specifically how solar panels are similar and compatible uses to other WM uses. They overstate the level of detail required. As explained in *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1989) 214 Cal.App.3d 1348, "great specificity is not required. It is enough if the findings form an analytical bridge between the evidence and the agency's decision." (*Id.* at p. 1356.) Further: "Findings are required to state only ultimate rather than evidentiary facts." (*Id.* at p. 1362; accord,

10

*Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 421–422 (*Young*) [agency is not required to support findings with subfindings].)

Regarding the WM area, the Board found the Project was similar and comparable to allowed uses and consistent with water quality and floodplain maintenance policies. The latter finding is supported by the hydrological study, which states the Project will not impact water supply or flood hazards. We are not persuaded by plaintiffs' argument that the hydrological study is not substantial evidence because water supply and flooding are not relevant to WM consistency. The record indicates that the county reasonably inferred that the WM designation was created to protect water supply and management of flood zones. The staff report explains that the "WM designation is appropriate to protect water supply and ensure floodplain management in the vicinity of Cayetano Creek" and that the Project's specific hydrological study was conducted in this regard. The Board reasonably relied upon county staff's interpretation of the purpose of the WM designation and the hydrological study. (*City of Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal.App.4th 1377, 1387 (*City of Rancho Cucamonga*) [" '[a]n agency may . . . rely upon the opinion of its staff in reaching decisions, and the opinion of staff has been recognized as constituting substantial evidence' "].)

Further, the Board's finding that the Project is similar or comparable to other allowed uses is supported by the record. The Board considered the Project a public utility use permissible in the WM designation, as county staff opined.[6] The county staff report explained that various policies in the ECAP

---

[6] Plaintiffs refer to comments planning department staff made in spring 2020 that they did not support having the Project on WM-designated areas. While there may have been internal debate and discussion about WM compatibility in the earlier stages of the Project, we do not find this

11

support the Project, including policy 285, which permits the county to " 'facilitate the provision of adequate gas and electric service and facilities to serve existing and future needs' "; policy 85, which promotes the " 'production of natural resources (e.g. agricultural, wind power, and mineral extraction)' "; and policy 13, which, as discussed *ante*, permits infrastructure, defined to include " 'structures and development necessary for the provision of public services and utilities,' " that is needed to service the East County.

At the Board hearing, county staff explained to the Board: "There is no language specifically pertaining to solar electrical uses in Measure D or in the [ECAP] themselves. There were similar projects in 2008 and 2012, which were deemed allowable as they were similar to other conditionally permitted uses that already exist in the County. The Planning Commission determined conformance with the General Plan and zoning. The zoning allows public utility uses. The General Plan allows public and quasi-public uses, wind farms and related facilities, utility corridors and similar uses compatible with

significant to the issues before us. Some of the staff comments to which plaintiffs cite are couched in less than definitive language ("RM and WM have generally been considered off limits to energy production." "Broadly speaking, the County considers the WM designation . . . not meant for large solar energy facilities.") and suggest further consideration is expected. More importantly, county staff ultimately determined that the Project was comparable to other uses allowed in WM areas, "such as . . . sand and gravel quarries, reclamation pits, and public use areas," and county staff further concluded the hydrological study, which was finalized in November 2020, demonstrated that the Project was consistent with the water quality and floodplain maintenance policies of the WM designation. The Board was permitted to rely upon county staff's final conclusions. (*City of Rancho Cucamonga, supra*, 135 Cal.App.4th at p. 1387.) It is not our role to reweigh conflicting evidence, but, rather, we "defer to procedurally proper consistency findings unless no reasonable person could have reached the same conclusion." (*Orange Citizens for Parks & Recreation, supra*, 2 Cal.5th at p. 155; *Sequoyah Hills Homeowners Assn., supra*, 23 Cal.App.4th at p. 717.)

12

agriculture. . . . Solar was deemed to be similar enough to other permitted uses and should be allowed with a conditional use permit, and a vote or general plan amendment are not required to allow solar uses.*"*

We find the record contains substantial evidence that the Project, an SEF which would generate electricity for public consumption to serve the needs of the East County and other communities, was considered to be infrastructure or a public utility use, which is similar and compatible with other uses specifically permitted in the WM designation. The Board's consistency finding was not arbitrary and capricious, and we cannot conclude that no reasonable person would make these determinations. (*San Francisco Tomorrow, supra*, 229 Cal.App.4th at p. 515.)

2. Compatibility with LPA

Regarding consistency with the LPA, the Board found the following: "In the [LPA] designation, the County's analysis has concluded that solar development is comparable to other uses specifically allowed, including public and quasi-public uses, windfarms, utility corridors, and similar uses compatible with agriculture. The Project, which includes solar arrays, vegetation, compacted dirt and graveled access roads, as well as sheep grazing, honeybee foraging, and raising egg-producing chickens, would promote continued agricultural use of the project site, consistent with the LPA land use designation." Further, with specific reference to issues raised by the plaintiffs in their appeal to the Board, the Board found: "The project is in conformance with the [ECAP], as amended by Measure D. . . . SEFs like the project meet the general plan goals and policies and conform to the allowable uses for the LPA and WM areas. SEFs like the project are similar in character to other uses explicitly allowed in the general plan designations, such as windfarms, quarries and public uses. The project does not increase

13

capacity and provides expanded service of renewable energy needed by customers in Alameda County and is therefore in conformance with the ECAP. A General Plan Amendment is not required prior to permitting this project."

Plaintiffs make three arguments in support of their position that substantial evidence does not support the Board's finding that the Project is consistent with the LPA designation. First, they argue that the Board improperly relied upon the planning department's prior determination (determination D-165) that SEF's are permitted in LPA areas and are a conditionally permitted use in the A (agricultural) zoning district. Second, they contend the Board's finding that the Project was similar to and compatible with the LPA's listed uses was conclusory. Third, they argue the Board failed to separately analyze whether the battery storage component of the Project was consistent with the LPA. None of plaintiffs' contentions have merit.

a.     *Determination D-165*

One of the Board's findings is that the Project is permissible in the A zoning district.[7] The finding refers to the Alameda County Planning Commission's June 16, 2008 consideration of determination D-165 pursuant to Alameda County Ordinance Code sections 17.54.050 and 17.54.060, which provide a procedure for resolving " 'doubt as to the district classification of a use not listed in any part of this title' . . . ." (Alameda County Ord. Code, § 17.54.050.) Alameda County Ordinance Code section 17.54.050, entitled "Uses not listed—Procedure," states: "Whenever there is doubt as to the district classification of a use not listed in any part of this title, the planning department may refer the matter to the planning commission for action

_____

[7] The zoning arguments are further addressed *post*.

14

pursuant to Section 17.54.060. The referral shall include a detailed description of the proposed use." Section 17.54.060 states: "Upon referral as provided in Section 17.54.050, the planning commission shall consider the district classification of a use not listed in any part of this title, and shall make such investigations as are necessary to compare the nature and characteristics of the use in question with those of the listed uses in the various districts. If the use is found to be, in all essentials pertinent to the intent of this title of the same character as a permitted use in any district or districts, or of the same character as a conditional use in any district or districts, the commission shall so determine and the order shall be final, unless a notice of appeal is filed pursuant to Section 17.54.670 within ten days after the date of such an order. The person requesting the determination shall be notified forthwith and the final determination shall become a permanent public record."

In 2008, the planning director initiated the request for what became known as determination D-165 in connection with consideration of another developer's (Greenvolts, Inc.) application for a CUP for a utility-scale solar field project on LPA land in the A zoning district. The planning staff considered the listed land uses in the LPA designation and in the A (agricultural) zoning district and found that a solar energy land use is allowable because it is similar to other conditionally permitted uses, including wind farms and public utility buildings. Planning staff requested that the planning commission determine that a privately owned solar energy production facility is (1) consistent with its general plan land use designation because it would constitute a quasi-public use that is a "similar compatible use" comparable to landfills, quarries, windfarms and utility corridors and (2) a conditionally permitted use in the A (agricultural) district because it

15

would be similar to other conditionally permitted uses, including wind farms and public utility buildings and similar uses.

On June 16, 2008, the planning commission voted unanimously to accept staff recommendations that a privately owned SEF is an allowable use on LPA lands and a conditionally permitted use in the A (agricultural) district. Plaintiffs acknowledge that there was no appeal from the commission's determination D-165 and, therefore, under Alameda County Ordinance Code section 17.54.60, the result became final. A month later, on July 17, 2008, the EBZA approved Greenvolts, Inc.'s application for a CUP for installation of a utility-scale solar electricity production facility in the A (agricultural) zoning district.[8]

The Board's resolution approving the Project at issue here refers to both the 2008 determination D-165 and a subsequent approval in 2011 of an application for a CUP filed by Cool Earth Solar for an SEF. Plaintiffs contend the Board may not rely on these prior findings because they relate to different projects. We question whether it is accurate to describe determination D-165 as relating to a specific project. Although the determination was presented to the planning commission during the approval process for a CUP for Greenvolts, Inc., the procedure followed was that provided under Alameda County Ordinance Code sections 17.54.050 and 17.54.060, which allows for the commission to determine whether a particular unlisted use is permissible in a zoning district because it is of the same character as a listed conditional use permitted in the same district. (Alameda County Ord. Code, §§ 17.54.050, 17.54.060.) In any event, we do not find it improper for the Board to reference determination D-165 or other prior approvals of SEF projects in support of its determination that the

---

[8] Although approved, the Greenvolts, Inc., project was not constructed.

16

Project's uses are similar to other LPA uses. Contrary to the plaintiffs' argument, the Board made findings related to this specific Project at issue, which was similar, at least in part, to prior SEF projects. It was not unreasonable for the Board to reference determination D-165 or a prior CUP approval for a Cool Earth Solar project as support for its finding that the current Project is similar to LPA's listed uses.

The cases plaintiffs cite to support their contention that the Board erroneously relied on previous findings relating to different projects are inapposite. *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506 addressed whether an agency's findings were sufficient to support a zoning variance, but it did not involve the issue of whether an agency may refer to prior findings on a similar issue. (*Id.* at pp. 518–522.) *Dore v. County of Ventura* (1994) 23 Cal.App.4th 320 found sufficient board findings that incorporated factual findings in staff reports. (*Id.* at pp. 328, 330; see *McMillan v. American General Finance Corp.* (1976) 60 Cal.App.3d 175, 185–186 [same]; *Harrington v. City of Davis* (2017) 16 Cal.App.5th 420, 440 [same].)

Nor does *Respers v. University of Cal. Retirement System* (1985) 171 Cal.App.3d 864 support plaintiffs' position. In *Respers*, the board of the University of California's retirement system rejected the findings of its hearing officer but did not make its own findings supporting its rejection of the hearing officer's proposed decision. (*Id.* at pp. 867, 869.) On appeal, the court first confirmed that an agency "may make findings by incorporating findings made by others." (*Id.* at p. 872.) It then found the record did not show that the board adopted as its own the findings a review committee made a year before the hearing officer's proposed decision. (*Id.* at pp. 869, 872.) The court explained, "Absent some indication an agency has adopted

17

the findings of others, there is no assurance that findings prepared by others reflect the view of the agency taking the action." (*Id.* at p. 872.) Here, the Board found that the project was consistent with the LPA designation as a comparable use to other specifically allowed uses. It further found that the county previously made similar consistency findings for other SEF projects, including determination D-165. Thus, unlike in *Respers*, here, the Board's findings indicated it agreed with determination D-165, and it made the same findings as to this Project. Nothing in *Respers* precludes the Board from considering prior similar consistency findings.

b.    *LPA Consistency Finding Is Not Conclusory*

The ECAP lists uses permitted in the LPA designation, including "public and quasi-public uses, solid waste landfills and related waste management facilities, quarries, windfarms and related facilities, utility corridors, and similar uses compatible with agriculture." The Project will provide solar power to utility customers by interconnecting to an electrical grid at an adjacent PG&E substation. In addition, other Project components include concomitant agricultural uses including sheep grazing and honeybee forage. The FEIR explained how the Project would promote continued agricultural use at the project site through sheep grazing and honeybee forage. In addition, the record includes an agricultural management plan which outlines the agricultural aspects of the Project. This is sufficient evidence to support the Board's determination that the Project was similar to other listed LPA uses, such as "windfarms, utility corridors, and similar uses compatible with agriculture." The LPA consistency finding was not arbitrary and capricious, and we cannot conclude that no reasonable person would make these determinations on this record. (*San Francisco Tomorrow, supra*, 229 Cal.App.4th at p. 515.)

18

c. *The Board Considered Battery Storage as a Component of the Project*

Plaintiffs argue that a separate analysis of LPA compatibility was required for the battery storage component of the Project. They cite no authority for this position, and their claim seems to ignore the record's repeated references to the battery energy storage component of the Project, including in the EIR, at the Board hearing, and multiple times in the Board's resolution. The Project is described as having multiple components, including solar panels, a substation and transmission line, an operations and maintenance building, and a battery energy storage system. As explained in the EBZA's statement of overriding considerations, the Project's "four-hour battery storage system would help to stabilize energy supplies and would provide energy generated from solar well into the peak-demand evening hours. This would reduce the need to employ backup generators, thus improving efficiency of the grid, reducing costs, and reducing the emissions that would come from the operation of the backup generators. Further, this project would allow utilities within the Bay Area to secure locally-generated renewable energy to meet their requirements under the Resource Adequacy framework adopted by the California Public Utilities Commission in 2004." A fair reading of the record is that the Board's findings that the Project was similar to other listed LPA uses necessarily includes all of the Project's components.

Plaintiffs' reliance on *Ideal Boat & Camper Storage v. County of Alameda* (2012) 208 Cal.App.4th 301 is misplaced. In *Ideal Boat & Camper Storage*, the county denied an application by a boat and camper storage business for a variance to expand its storage facility to add over 700 additional vehicles and boats on 30 acres of land in the LPA designation. (*Id.* at pp. 304–305, 307, 308.) County staff recommended denial of the

19

application because it would constitute an expansion of a nonconforming use and was contrary to Measure D. (*Id.* at p. 309.) The planning commission denied the application, and the Board denied the owner's appeal. (*Id.* at p. 310.) The trial court denied the owner's writ petition. On appeal, our colleagues in Division Four affirmed the Board's finding that the owner's existing storage facility was a nonconforming but preexisting use that could continue. However, expansion of the storage facility was contrary to Measure D. (*Id.* at pp. 313–315.) Plaintiffs assert that because *Ideal Boat & Camper Storage* upheld a Board determination that storage of boats and campers was a nonconforming use, the SEF at issue here is likewise a nonconforming use because it includes battery storage. We disagree. *Ideal Boat* says nothing about whether an SEF is permitted in the LPA designation, and it does not stand for the position that all types of storage, in any capacity, are nonconforming uses in the LPA designation.

## II. *Zoning*

In addition to the Board's findings that the Project was similar in character to uses explicitly allowed in the ECAP's LPA and WM areas, such as windfarms, quarries, and public uses, the Board also found the Project is allowable under the county's zoning ordinances. The Board referenced the planning commission's prior determination D-165 that SEF's "like the project are similar in character to other uses explicitly allowed by the Zoning Ordinance in the A District . . . ." Plaintiffs argue solar and battery storage are prohibited in the A (agricultural) zoning district and that determination D-165's contrary conclusion is not applicable to the Project.

"Similar to an agency's interpretation of its own general plan, 'an agency's view of the meaning and scope of its own [zoning] ordinance is entitled to great weight unless it is clearly erroneous or unauthorized.' "

20

(*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1193 (*Anderson First Coalition*).) We find the Board's determination that the Project is consistent with uses permitted in the A (agricultural) zoning district is not clearly erroneous or unauthorized, and the record contains substantial evidence supporting the Board's determination.

As stated in the Board's findings, the A (agricultural) district's intent is "to promote implementation of general plan land use proposals for agricultural and other nonurban uses, to conserve and protect existing agricultural uses, and to provide space for and encourage such uses in places where more intensive development is not desirable or necessary for the general welfare." (Alameda County Ord. Code, § 17.06.010.) Conditional uses permitted in the A district include drilling for oil, gas or other hydrocarbon substances, public utility building or uses, and privately owned wind-electric generators. (*Id.*, § 17.06.040.)

Plaintiffs argue that the Board's reliance on determination D-165 to find that the Project was conditionally permitted in the A (agricultural) district was improper because determination D-165 was not a legislative determination but, instead, was "quasi-judicial." According to plaintiffs, determination D-165 has no general application to other SEF projects. As discussed *ante*, determination D-165 was made pursuant to Alameda County Ordinance Code sections 17.54.050 and 17.54.060, and although the Greenvolts, Inc., 2008 application was the impetus for determination D-165, the determination was made separately from the approval of the Greenvolts, Inc., application. Defendants argue that determinations made under section 17.54.060, such as determination D-165, generically determine whether an unlisted use is suitable in a particular zoning district and if they become final they are a matter of " 'permanent public record . . . .' " Neither

21

party cites case authority addressing the reach or precedential value of a planning commission's determinations under section 17.54.060 or similar ordinances allowing for a determination of compatibility of an unlisted use in a particular zoning district.[9]

We need not decide whether determination D-165 is a binding determination applicable to all applications for SEF's in the A (agricultural) zoning district because the record contains substantial evidence supporting the Board's finding that the Project is "similar in character to other uses explicitly allowed by the Zoning Ordinance in the A District, such as windfarms and public utility uses." (Alameda County Ord. Code, § 17.06.040.) As discussed *ante*, the Project will provide solar power to utility customers by interconnecting to an electrical grid at an adjacent PG&E substation. The FEIR states that county counsel determined solar facilities constitute quasi-public uses consistent with windfarms and utility corridors. The Board relied on the staff reports and agreed that the Project was a public utility use. The FEIR further provides that the Project will continue agricultural use through sheep grazing and honeybee forage at the Project site. On this record, we do not find that the county's interpretation of its zoning ordinance is clearly erroneous or unauthorized. (*Anderson First Coalition, supra*, 130 Cal.App.4th at p. 1193; see *City of Rancho Cucamonga, supra*, 135 Cal.App.4th at p. 1387 [" '[a]n agency may . . . rely upon the opinion of its staff in reaching decisions, and the opinion of staff has been recognized as constituting substantial evidence' "].)

---

[9] Plaintiffs cite *Bringle v. Board of Supervisors* (1960) 54 Cal.2d 86 as support for their position that determination D-165 is limited to the Greenvolts, Inc., project. But *Bringle* involves a zoning variance and does not discuss a zoning ordinance with a procedure similar to Alameda County Ordinance Code section 17.54.060. (*Bringle*, at p. 90.)

22

Nor are we persuaded by plaintiffs' argument that the battery storage component of the Project is prohibited in the A (agricultural) zoning district. As discussed *ante*, battery storage was a part of the overall Project, and no separate subfindings of compatibility are required. (*Young, supra*, 10 Cal.App.5th at pp. 421–422.) The county staff explained to the Board that the battery storage component was an ancillary part of the Project, comprising five acres of the total 347-acre Project site. Further, the EBZA's statement of overriding considerations explains the importance of the battery energy storage component: to allow utilities to secure locally generated renewable energy. Substantial evidence supports the Board's finding that the entire Project, including the battery storage component, is a conditionally permitted use similar to other uses permitted in the A (agricultural) zoning district, such as windfarms and utility uses.

## III.   *CEQA*

Plaintiffs complain that the EIR failed to adequately analyze the Project's water needs and wildfire risks. Our CEQA review is based on section 21168.5, which states that our "inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." We review the adequacy of an EIR under the same abuse of discretion standard. (*Sequoyah Hill Homeowners Assn., supra*, 23 Cal.App.4th at p. 712.) "It is not our function to pass on the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document. We look 'not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' (Guidelines, § 15151.)" (*Ibid.*) Further, we presume the county's decision to certify the EIR was correct; plaintiffs bear the burden of

establishing otherwise.  (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530.)

A.    **Water Analysis**

Plaintiffs acknowledge that the EIR assessed the Project's water needs and relied on a water supply assessment and hydrology study (WSA) which was attached to the EIR.  The FEIR concluded that the Project would not have a significant impact on water supplies available to serve the Project, which include groundwater pumped from the Livermore Valley Groundwater Basin, surface water imported to the project area via the Zone 7 Water Agency, and local groundwater banking operations.  The WSA analyzed the water demands of each aspect of the Project, including during construction, operation, and decommissioning.

Plaintiffs' first argument regarding the water supply is that the EIR failed to adequately account for the water needed for the agricultural landscape buffer.  The WSA explains that the Project will include a demand for irrigation water to establish native and drought-resistant landscaping plants, which would be fully established within three years.  After this period, the WSA states, "irrigation would cease and landscape plants would be sufficiently established to be supported by the natural environment."  The FEIR states the proposed landscaping would be irrigated via an on-site water storage tank and that all plants would be drought-tolerant.

Plaintiffs argue that the EIR's analysis failed to consider additional water needs that may be required based on the EBZA's imposition of an additional condition to plant agricultural crops on the landscaping buffer. Plaintiffs characterize this condition as "a significant new agricultural crop landscaping requirement" and state that the EBZA required the Project developer to " 'plant agricultural crops such as olive trees and/or grape

24

vines' " on the Project's eastern and northern boundaries. According to plaintiffs, the county prejudicially abused its discretion when it approved the EIR because the EIR did not assess "this significant life-of-the-Project agricultural landscaping and irrigation requirement in its discussion of the Project's water supply needs or their potential environmental impacts."

There are several problems with plaintiffs' argument. First, plaintiffs selectively quote from the EBZA resolution, which leads to a mischaracterization of the new condition. The full quote of the additional condition imposed by the EBZA resolution states: "WHEREAS, based on facts in the record regarding the significant effects of the project on scenic qualities and preservation of agriculture as a quality of open space, the Board determined than [*sic*] an additional condition of approval is necessary and proper providing for increased setbacks of 100 feet from the public rights-of-way of North Livermore Avenue and Manning and Hartman Roads, and 80 feet from the western project boundary, within which, instead of decorative trees and landscaping the project developer shall plant agricultural crops such as olive trees and/or grape vines *to the extent that such species are native to California, drought-resistant, avoid excessive irrigation requirements* and maintain the prevailing visual and and [*sic*] agricultural character." (Boldface omitted, italics added.) The Board resolution included the same statement, and the Board's authorization of the Project required an "agricultural planting and screening buffer within [the] setbacks, and on which native drought-resistant agricultural crops shall be planted pursuant to an agricultural plan . . . ." Further, the Board required that the agricultural plan be approved by the planning director. The Project developer submitted an agricultural plan describing the use of "drought tolerant [plants], requiring no additional water sources after planting &

25

establishment." The Board resolution includes a mitigation measure requiring the agricultural buffer to be "adequately irrigated to establish the long-term viability of the buffer . . . ."

Second, plaintiffs' argument is based on an unfounded assumption that the additional agricultural crop landscaping condition imposed by the EBZA requires irrigation to continue throughout the 50-year life of the Project, which was not analyzed in the WSA. Contrary to plaintiffs' contention, the record shows that the EBZA and the Board consistently discussed an agricultural landscape buffer as including "drought-resistant" plants that would "avoid excessive irrigation . . . ." While the precise details regarding the specific plants in the buffer area remain an open question, it is certain that they will be drought-tolerant and not require significant water needs. Thus, the WSA's analysis of irrigation needed to *establish* the landscape buffer is consistent with the contemplated landscape buffer and is sufficient evidence to support the Board's findings.

Plaintiffs next argue that the WSA relied on speculative water sources. As noted *ante*, the WSA was attached to the FEIR, and it analyzed the water demands for the Project during construction, operation and decommissioning. The FEIR concluded that the Project would not have a significant impact on water supplies available to serve the Project, which include groundwater pumped from the Livermore Valley Groundwater Basin, surface water imported to the Project area via the Zone 7 Water Agency, and local groundwater banking operations. It further provides estimates of water usage over the Project's 50-year operations period. Plaintiffs argue that the WSA failed to consider the water needs and supply for the full 50 years of the Project. They cite one portion of a footnote contained in the WSA, which states, "Due to the project's lifetime being anticipated at 50 years, it would be

26

highly speculative to characterize water supply or reliability conditions at this time," and contend the WSA inadequately analyzed water needs. When read in context, it is clear that the footnote is referring to possible potential water demands to operate the Project if it is repowered *after* 50 years. The WSA states that in the event of repowering rather than decommissioning, additional CEQA review and permitting would likely be required and therefore the WSA did not analyze water demands associated with possible repowering after the Project's 50-year lifespan.

However, the WSA did consider the Project's water needs over its 50-year lifespan. Regarding supply, the WSA referred to the Alameda County Zone 7 Urban Water Management Plan (UWMP), which provides 20-year supply projections under normal-, single-dry-, and multiple-dry-year scenarios. The current UWMP is from 2015 and projects water availability through 2035. The WSA explains that the UWMP projects a surplus water supply under all considered drought scenarios, including normal-year, single-dry-year, and multiple-dry-year conditions. The WSA concluded that because the site's primary use as a solar project is less water-intensive than agricultural uses, the actual water demands for the Project will be lower than planned for the site in the UWMP. The FEIR summarized the WSA and concluded that it is anticipated that sufficient water would be available to serve the Project.

Plaintiffs argue that the FEIR fails to demonstrate the long-term sufficiency of the water supply for the entire 50 years of the Project because it relies on the UWMP supply projection through 2035. This, they claim, amounts to reliance on speculative water sources that are an inadequate basis for decision making under CEQA. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412,

27

432.) We are not persuaded. The FEIR and the attached WSA explained the Project's projected water needs and analyzed the water supply projections under the UWMP. They further explained zone 7's diversified water supply portfolio, including groundwater and banking efforts that receive surplus water during wet years, and surface water. The FEIR and WSA properly relied upon the available information contained in the most recent UWMP to identify and analyze "future water supplies [that] bear a likelihood of actually proving available." (*Vineyard Area Citizens for Responsible Growth, Inc.*, at p. 432 ["Requiring certainty [of sufficient future water supplies] when a long-term, large-scale development project is initially approved would likely be unworkable, as it would require water planning to far outpace land use planning"]; Guidelines, § 15151 ["the sufficiency of an EIR is to be reviewed in light of what is reasonably feasible"].) We find substantial evidence supports the finding that the Project will have an adequate water source. Plaintiffs, who offer no explanation as to why the water supply for zone 7 is likely to change significantly after 2035, fail to meet their burden of demonstrating that the EIR was not adequate. (§ 21167.3; *Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 327–328 [persons challenging EIR bear burden of proving it is legally inadequate and that agency abused its discretion in certifying it].)[10]

---

[10] For the first time on appeal, plaintiffs assert the EIR failed to analyze potential environmental impacts of having to truck water onto the site. Further, plaintiffs include no record citations or reasoned analysis of this issue. Thus, the claim is forfeited. (*Friends of the Eel River v. Sonoma County Water Agency* (2008) 108 Cal.App.4th 859, 878 [a reviewing court "may treat an issue as waived 'when an appellant makes a general assertion, unsupported by specific argument' "]; *Family Health Centers of San Diego v. State Dept. of Health Care Services* (2021) 71 Cal.App.5th 88, 98.)

## B. Wildfire Risks

Finally, plaintiffs argue the EIR did not adequately analyze the Project's impact on wildfire risks. They acknowledge that they did not raise this issue in the trial court and offer no explanation for their omission. Even if we were inclined to consider plaintiffs' claim for the first time on appeal, we would still find the claim forfeited because plaintiffs fail to set out all relevant evidence regarding the EIR's wildfire risk analysis. (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 934–935 [" 'As with all substantial evidence challenges, an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden' "].)

To the extent plaintiffs' claim is limited to whether the EIR was procedurally inadequate because it omitted required information in its assessment of wildfire risk, plaintiffs again fail to meet their burden. They ignore much of the EIR's wildfire analysis. They assert the EIR's conclusion that the Project's impact on wildfire risk was less than significant was based on the Project site's classification as a moderate fire hazard zone and that vegetation on the site would be managed through sheep grazing. They further assert the EIR did not consider wind impacts or that the Project site will include solar batteries. Plaintiffs are wrong. The EIR specifically considered the site's topography and wind conditions and explained: "The project substation would be constructed to provide the necessary circuit breakers, switches, protection relays, and other necessary equipment to reliably and safely protect the electrical infrastructure. Additionally, each battery unit in the battery storage system would be constantly monitored by

a battery management system to ensure safe operations. . . . If there were to be multiple failures in this multi-level safety system, an automatic fire suppression system would kick in. Emergency fire kits would be kept on site during construction and operation, and a 250,000-gallon water storage tank for fire suppression would be located adjacent to the battery storage system . . . ."

## DISPOSITION

The judgment is affirmed. Respondents are entitled to costs on appeal.

_____
Jackson, P. J.

WE CONCUR:

_____
Simons, J.

_____
Chou, J.

A165768/*Save North Livermore Valley v. County of Alameda*